**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| LKQ CORPORATION and KEYSTONE AUTOMOTIVE INDUSTRIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | Case No. 1:23-cv-00034 |
| COY SKIPPER, | ) ) | |
| Defendant. | ) ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

NOW COMES Plaintiffs, LKQ Corporation (also "LKQ") and Keystone Automotive Industries, Inc. ("Keystone"), by and through their attorneys, FISHER PHILLIPS LLP, and for their Complaint for Injunctive Relief and Monetary Damages states as follows:

**NATURE OF THE ACTION**

1.      LKQ and Keystone ("Collectively, "Plaintiffs") bring this action against Defendant Coy Skipper (also "Skipper") for violating certain confidentiality, non-competition, and non-solicitation obligations that he owes Plaintiffs.  LKQ, through its wholly-owned subsidiary Keystone, formerly employed Skipper in a senior management role as an Area Manager of LKQ's mobile services division, called Elitek Vehicle Services.  As a condition to obtaining and/or continuing his employment with LKQ, and the ability to obtain substantial LKQ restricted stock, Skipper entered into and agreed to abide by certain non-competition, non-solicitation and confidentiality restrictions that are contained in his LKQ Confidentiality, Non-Competition and Non-Solicitation Agreements and Restricted Stock Unit Agreements.  Skipper resigned from LKQ and accepted substantially similar and competitive employment with one of LKQ's direct competitors.  Through this action, LKQ seeks damages for Skipper's conduct in violation of his

contractual agreements with LKQ, the forfeiture and recoupment of restricted stock unit grants that were expressly conditioned on Skipper's fidelity to his restrictive covenant agreements with LKQ, and injunctive relief to prevent Skipper from engaging in further conduct in violation of his legal obligations to LKQ.

## THE PARTIES

2.      Plaintiff LKQ Corporation was, at all relevant times, and is a Delaware corporation with its principal place of business at 500 W. Madison Street, Suite 2800, Chicago, Illinois.

3.      Plaintiff Keystone Automotive Industries, Inc., was, at all times, and is a California corporation with its principal place of business at 500 W. Madison Street, Suite 2800, Chicago, Illinois.

4.      Defendant Coy Skipper resides at 4904 Sundance PL Loop, Mulberry, Florida, and was a citizen of the State of Florida during the period of at least 2021 to present.   Skipper was not a resident or citizen of the State of Illinois during the events at issue in the Complaint.

## JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over Skipper because he consented to the jurisdiction of this Court under the terms of the Confidentiality, Non-Competition, and Non-Solicitation Agreements and Restricted Stock Unit Agreements that are at issue in this case.

6.      Alternatively, the Court has personal jurisdiction over Skipper because he entered into various contracts with LKQ that were drafted, negotiated, and/or performed, in part, at LKQ's principal place of business in Chicago, Illinois.  The unlawful conduct at issue in this case was (1) intentional; (2) expressly aimed at and directed to LKQ in the forum state of Illinois; and (3) Skipper was aware that his injurious effects would be felt in the forum state of Illinois.

2

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Because LKQ (Illinois, Delaware) is a citizen of a different state than Skipper (Florida), there is complete diversity of citizenship.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claim substantially arises out of incidents or events occurring in this judicial district.  In the alternative, venue is proper because Skipper consented to litigation in this Federal court in the Restricted Stock Unit Agreements and the Confidentiality, Non-Competition, and Non-Solicitation Agreements that are at issue in this litigation.

## FACTUAL ALLEGATIONS

**A.      LKQ and Its Mobile On-Site Vehicle Services**

9.      LKQ is, among other things, a national supplier of salvage and aftermarket automobile parts and products to mechanical shops, repair shops, and other customers.  LKQ also markets, sells and provides mobile-onsite vehicle services to its customers, including, but not limited to, owners and operators of trucking and automotive fleets, automotive and mechanical repair facilities, and other trucking and automotive customers.

10.      Keystone is a wholly owned subsidiary of LKQ and is among other things, a leading distributor of specialty automotive equipment and accessories.

11.      In April of 2019, LKQ acquired the assets of two mobile services companies called VeTech Automotive Electronics ("VeTech") and Elite Electronics ("Elite").  The consolidated companies operate under the Keystone brand Elitek Vehicle Services ("Elitek").

12.      Elitek provides sophisticated mobile and on-site technical solutions, including, but not limited to, pre- and post-collision repair diagnostics, ADAS related calibrations, re-flashing,

3

programming, air bag replacements, theft and vandalism repair, frame replacements and full mechanical services to its customers nationwide.

13.  To perform these mobile services, Elitek employs a fleet of mobile technicians who provide on-demand and on-site services for what are typically very time-consuming and demanding repairs.

14.  Elitek's mobile technical services improve LKQ's customers' cycle times and associated repair expenses and provide LKQ's customers with an enhanced customer experience.

15.  LKQ invests significant time, money, and marketing resources to build its brands, including its Elitek brand, in the marketplace, investing in hiring, marketing, advertising, and product and technology development, and fostering long-term customer relationships.

16.  LKQ has accumulated key customer contact information and information relating to business needs and service requirements necessary to develop long-term customer relationships across its entire business, including its Elitek business.

17.  Through these efforts, LKQ has developed a strong reputation in the marketplace and engendered substantial goodwill with its customers, including its Elitek customers who purchase LKQ's mobile, on-site vehicle services.

18.  LKQ conducts its Elitek business throughout the United States, including, but not limited to, in the Southeastern United States and the States of Georgia, Florida, Texas, Kentucky, North Carolina, Tennessee, and Alabama.

19.  Elitek's revenue in 2021 was in excess of $35 million.

**B.    Background Regarding Skipper's Employment with LKQ**

20.  Skipper began his employment with LKQ on or about April 5, 2020.

4

21.     Prior to his employment with LKQ, Skipper worked for Elite and joined LKQ as part of LKQ's acquisition of Elite.

22.     On or about April of 2020, LKQ promoted Skipper to the position of Area Manager for Mobile Automotive Tech, with managerial and supervisory authority over a territory encompassing the State of Georgia.

23.     At times in 2021 and 2022, and while still serving in the position of Area Manager, Skipper was based in the State of Florida.  In 2021 and 2022, Skipper oversaw a geographical territory encompassing Georgia, Florida, and North Carolina.

24.     Skipper held the title of Area Manager until he voluntarily resigned his employment, which was effective October 14, 2022.

25.     Commensurate with his job duties in a senior management position, LKQ paid Skipper a six-figure compensation package, including salary, bonuses, and other compensation. Prior to voluntarily resigning his employment, Skipper's gross annualized compensation exceeded $130,000.

26.     As Area Manager, Skipper was responsible for the day-to-day operational and financial management relating to LKQ's Elitek business and customers.  Skipper had direct control and responsibility for recruiting and hiring staff, managing staff, employee safety, business development, marketing, sales, and client account services.

27.     Skipper also had profit and loss responsibility and specific revenue, sales, and profitability goals.  Skipper was also responsible for assisting in annual business planning, strategic planning, and business forecasting.

28.     Skipper's duties as an Area Manager of the Elitek mobile business also included managing and participating in sales to prospective and existing customers, interacting with

customers, implementing marketing and sales initiatives and promotions, developing and maintaining relationships with customers, and managing customer retention.

29.     Skipper's ability to develop and maintain key customer relationships was critical to LKQ's efforts to drive sales and retention.

30.     During the course of his employment, Skipper received training and/or instruction relating to LKQ's Elitek marketing, sales, and technical processes, techniques, and methodologies. This included, among other things, training and instruction relating to the development and management of customer relationships, sales and marketing plans, servicing LKQ's Elitek customers, the technical support of LKQ's Elitek sales and product initiatives, and contractual agreements with customers.

31.     In his capacity as an Area Manager of the Elitek mobile business, Skipper had access to LKQ's customer information, customer requirements, pricing information for customers, historical sales, sales plans and proposals, financial performance, margins, and agreements relating to LKQ's Elitek mobile business.

32.      This information has substantial commercial and competitive value because it is not generally known to or readily ascertainable through proper means by competitors who can obtain economic value from this information.

33.     LKQ takes reasonable measures to protect its confidential business and trade secret information, including, but not limited to, requiring passwords to be used to access Company computer systems and records, and having policies that expressly prohibit the use, removal, and disclosure of such information outside the Company.

**C.     Skipper and LKQ Enter Into Restricted Stock Unit Agreements in 2021 and 2022**

34.     Beginning in 2021, and in consideration of his substantial responsibility in a senior manager position, LKQ designated Skipper a "Key Person" and made him eligible for substantial grants of LKQ stock in accordance with LKQ's equity compensation incentive plan.

35.     On or about February 19, 2021, and February 18, 2022, LKQ and Skipper entered into a separate "Restricted Stock Unit Agreement" providing Skipper with the right to exercise shares of LKQ stock pursuant to the terms, conditions, and vesting schedules set forth in the respective agreements.  *See* True and Correct Copies of LKQ and Skipper's 2021 and 2022 Restricted Stock Unit Agreements, attached hereto at Exhibits A and B (referred to collectively as the "RSU Agreements" and individually as the "2021 RSU Agreement" and the "2022 RSU Agreement").

36.     As a material inducement for LKQ to enter into these agreements and provide Skipper with substantial equity compensation, Skipper agreed to the following restrictive covenants ending nine months after Skipper's separation of employment with LKQ (referred to collectively as the "RSU Restrictive Covenants").

37.     Pursuant to the RSU Agreements, Skipper agreed to the following non-competition, non-solicitation, and confidentiality covenants:

17.     <u>Non-Competition and Confidentiality</u>…

(a)(i)   the Key Person shall not directly or indirectly (1) be employed by, engage or have any interest in any business which is or becomes competitive with the Company or its Subsidiaries or is or becomes otherwise prejudicial to or in conflict with the interests of the Company or its Subsidiaries, (2) induce any customer of the Company or its Subsidiaries to patronize such competitive business or otherwise request or advise any such customer to withdraw, curtail or cancel any of its business with the Company or its Subsidiaries or (3) hire or solicit for employment any person employed by the Company or its Subsidiaries or hire any person who was employed by the Company or its Subsidiaries at any time within nine months of such hire; provided, however, that this

7

restriction shall not prevent the Key Person from acquiring and holding up to two percent of the outstanding shares of capital stock of any corporation which is or becomes competitive with the Company or is or becomes otherwise prejudicial to or in conflict with the interests of the Company if such shares are available to the general public on a national securities exchange or in the over-the-counter market; and

(ii)     the Key Person shall not use or disclose, except for the sole benefit of or with the written consent of the Company, any confidential information relating to the business, processes or products of the Company. Nothing in this Agreement, however, prohibits the Key Employee from reporting violations of law or regulation to any U.S. federal, state or local governmental or law enforcement branch, agency or entity (collectively, a "Governmental Entity"), or from cooperating with any Governmental Entity, including the EEOC, the Securities and Exchange Commission or the Department of Justice.

*See* RSU Agreements, Section 17, Exhibits A & B.

38.     Under the terms of the RSU Agreements, LKQ and Skipper also agreed that, if the "Key Person" is not in compliance with the restrictive covenants set forth in the respective RSU Agreements for a period of nine months following Skipper's separation of employment, then Skipper agreed to forfeit his restricted stock and related proceeds as set forth below:

…the RSUs, the Shares underlying the RSUs and any proceeds received by the Key Person upon the sale of Shares underlying the RSUs shall be forfeited by the Key Person to the Company without any consideration therefore, if the Key Person is not in compliance, at any time during the period commencing on the Grant Date and ending nine months following the Key Person's Separation from Service…

*See* RSU Agreements, Section 17, Exhibits A & B.

39.     Further, the parties agreed to the following provisions governing the forfeiture and/or repayment of the restricted stock units under the RSU Agreements as follows:

The forfeiture shall be effective as of the date of the occurrence of any of the activities set forth in Section 17(a) above. If the Shares

underlying the RSUs have been sold, the Key Person shall promptly
pay to the Company the amount of the proceeds from such sale.

*See* RSU Agreements, Section 17(b), Exhibits A & B.

40.     In addition, the parties agreed that LKQ "shall be" entitled to injunctive relief for
any violation of the RSU Restrictive Covenants in Section 17 of the 2021 and 2022 RSU
Agreements. *See* RSU Agreements, Section 17, Exhibits A & B.

41.     Section 20 of the 2021 and 2022 RSU Agreements further expound upon LKQ's
right to clawback, cancel, and recoup any and all amounts received by Skipper under LKQ's equity
incentive plan and in accordance with any applicable law. *See* RSU Agreements, Section 20,
Exhibits A & B.

42.     LKQ and Skipper further agreed that: "any and all actions concerning any dispute
arising hereunder shall be filed and maintained only in a state or federal court sitting in the County
of Cook, State of Illinois. The parties hereto specifically consent and submit to the jurisdiction of
such court." *See* RSU Agreements, Section 15, Exhibits A & B.

43.     The RSU Agreements provide that they are governed by, and construed and
enforced in accordance with, the laws of the State of Delaware, without giving effect to principles
and provisions thereto relating to conflict or choice of laws. *Id.*

44.     Skipper reviewed, assented to, and accepted each of the 2021 and 2022 RSU
Agreements. Skipper's acceptance was manifested using his unique login identification and user
password. LKQ's equity management software, Certent, shows the specific date and time that
Skipper accepted each grant and the corresponding contractual documents accepted within the
grant package.

45.     Skipper's acceptance of the respective RSU Agreements was also manifested based
on his performance under the RSU Agreements, including the vesting and granting of restricted

FP 45966652.1

stock units to Skipper, which were subsequently exercised and sold by Skipper, in accordance with the terms and conditions of the respective RSU Agreements.

**D.**     **Skipper and LKQ Enter Into RCA Agreements.**

46.     In consideration of LKQ's agreement to issue him restricted stock under the RSU Agreements and his continued employment and other compensation as an Area Manager, Skipper also entered into Confidentiality, Non-Competition, and Non-Solicitation Agreements with LKQ on or about the same dates as the RSU Agreements (i.e., *See* True and Correct Copies of the February 19, 2021, and February 18, 2022 Confidentiality, Non-Competition, and Non-Solicitation Agreements, attached hereto at Exhibits C and D (referred to collectively as the "RCAs" and individually as the "2021 RCA" and the "2022 RCA").

47.     Skipper reviewed, assented to, and accepted the 2021 and 2022 RCAs and manifested his acceptance through his unique login identification and user password.  *See* 2021 and 2022 RCAs, Exhibits C & D.

48.     The language in the RCAs referenced below is the same for each Agreement.

49.     Pursuant to the language in the RCA's: "Employee desires to receive a grant of an equity incentive award from Employer under the Employer's 1998 Equity Incentive Plan…"  *See* RCAs, pp. 1, Exhibits C & D.  "NOW THEREFORE, in consideration of the grant of the equity incentive award to Employee as of the date of this Agreement and in consideration of Employee's employment by and with Employer or one of its subsidiaries (this Agreement being a condition of such award grant and employment), Employer and Employee agree to the following conditions..." set forth in the RCAs.  *Id.*

50.     In other words, the granting of restricted stock by LKQ was also conditioned on Skipper's agreement to be bound by the separate promises contained in the RCAs.

51.     Under the terms of each of the RCAs, Skipper agreed to and entered into a Non-Competition covenant ("Non-Competition Covenant"). *Id.* Pursuant to this covenant:

> 2.     <u>Non-Competition</u>. Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and for a period of nine months following the termination of Employee's employment with Employer (i) by Employee for any reason, or (ii) by Employer for cause, engage in, represent, furnish consulting services to, be employed by or have any interest in (whether as owner, principal, director, officer, partner, agent, consultant, lender, shareholder, member or otherwise) any business that would be competitive with any business conducted by Employer or its subsidiaries on the date of this Agreement or any other business conducted by Employer or its subsidiaries during Employee's employment, anywhere within a 75 mile radius of any facility of Employer or its subsidiaries at which Employee worked or over which Employee exercised managerial control while employed by Employer; ***provided, however*, that the post-termination restrictions of this Section 2 shall not apply in any jurisdiction in which such restrictions are invalid or unenforceable under applicable law then in effect;** provided further, however, Employee may acquire and hold an aggregate of up to two percent of the outstanding shares of any corporation engaged in any such business if such shares are publicly traded in an established securities market. Notwithstanding the foregoing, the period of time following termination of employment during which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

*See* RCAs, Section 2, Exhibits C & D (bold and italics in original).

52.     Also under the terms of the RCAs, Skipper entered into a Non-Solicitation covenant ("Non-Solicitation Covenant"). *Id.* Pursuant to this covenant:

> 3.     <u>Non-Solicitation</u>. Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and for a period of nine months following the termination (for any reason) of Employee's employment with Employer, induce any customer of Employer or its subsidiaries to patronize any other business, request or advise any other person or entity with which the Employer has a business relationship (including customers and suppliers) to

> withdraw, curtail or cancel any of its business with Employer or its subsidiaries, or hire or solicit for employment, or assist any other person or entity in hiring or soliciting for employment, any person employed by any of Employer or its subsidiaries. Notwithstanding the foregoing, the period of time following termination of employment during which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

*See Id.*, Section 3.

53.     Under each of the RCAs, the parties agreed that, in the event a provision is found to be unenforceable or invalid, a court shall have the power to reduce the duration and/or area of any restrictive covenant contained therein or delete or sever a provision to render the agreement enforceable as follows:

> If any provision of this Agreement, as applied to any party or to any circumstances, is adjusted by a court to be invalid or unenforceable, the same shall in no way affect any other provision or any other part of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. If any such provision, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form such provision shall then be enforceable.

*See Id.*, Section 5.

54.     Also under the terms of the RCAs, LKQ and Skipper agreed that, "[a]ny and all actions concerning any dispute arising hereunder shall be filed and maintained only in a state or federal court sitting in the County of Cook, State of Illinois. The parties specifically consent and submit to the jurisdiction of such court." *See Id.*, Section 8.

55.     The RCAs provide that they shall be governed by and construed in accordance with the laws of the state in which the Employee resides without regard to the conflict of laws rules thereof. *See Id.*, Section 7.

FP 45966652.1

56. The RCAs provide that the non-breaching party shall be entitled to injunctive relief in addition to monetary damages sustained as a result of each breach. *See Id.*, Section 6.

57. The covenants and restrictions contained in the 2021 and 2022 RSU Agreements, and the 2021 and 2022 RCAs are reasonable in scope and duration and are necessary to protect LKQ's legitimate business interests in their confidential information, goodwill, and customer and employee relationships, among other interests.

E.     **Skipper Engages in Conduct in Violation of His Contractual Obligations to LKQ.**

58. On September 26, 2022, Skipper provided LKQ with notice that he was voluntarily resigning his employment with LKQ. Skipper's resignation became effective on October 14, 2022. At the time that he voluntarily resigned, Skipper was a senior level Area Manager in LKQ's Elitek business.

59. At the time of his resignation, Skipper stated that he was resigning to pursue his "long term goal of being in real estate."

60. Shortly after Skipper's employment with LKQ ended, LKQ learned that Skipper had begun a new position as a Southeast Regional Manager for All Clear Diagnostics and Calibration ("All Clear").

61. All Clear competes directly with LKQ's Elitek business in marketing, selling and providing the same or similar mobile, on-site vehicle services to the same customers as prospective customers to which Elitek markets, and sells and provides such services in the Southeastern United States, including within the territory that Skipper oversaw as an Area Manager for LKQ.

62. All Clear provides directly competitive services in the States of North Carolina, Florida, and Georgia.

63.     All Clear competes directly with LKQ's Elitek business in providing diagnostic, calibration, and programming services to the same customers or prospective customers to which Elitek markets.

64.     Skipper is engaged in substantially similar employment as a Regional Manager selling directly competitive products and services within the same or substantially similar territory that he oversaw as an Area Manager for LKQ.

65.     Upon information and belief, Skipper is engaged in managerial, hiring, sales, and marketing activities on behalf of All Clear that are substantially similar to the activities that he performed as an Area Manager for LKQ relating to the marketing, sales and provision of mobile, on-site vehicle services.

66.     All Clear operates its business and provides competitive mobile, on-site vehicle services within a 75-mile radius within the same territory over which Skipper exercised managerial control while employed by LKQ, and within the same States where Skipper was based for LKQ.

67.     Upon information and belief, and since joining All Clear, Skipper has directly or indirectly engaged in soliciting and inducing LKQ's customers to purchase their mobile, on-site vehicle services from All Clear and/or to withdraw, curtail or cancel doing such business with LKQ in violation of his restrictive covenant obligations owed to LKQ.

68.     Upon information and belief, since Skipper began working for All Clear, Skipper has reached out to, set up meetings with, and/or personally visited Elitek clients whom he previously serviced on behalf of LKQ for purposes of soliciting the sale of All Clear's competing mobile, on-site vehicle services.

69.     In soliciting these LKQ customers, Skipper has, upon information and belief, relied upon, utilized and disclosed LKQ's confidential information relating to its customer contracts,

14

pricing, financial information, gross margins and other customer-related data in order to undercut LKQ's prices and offer more favorable pricing discounts all in an effort to improperly and unfairly take business away from LKQ.

70.     On information and belief, since joining All Clear, Skipper has, directly or indirectly, engaged in soliciting for employment and/or hiring LKQ's employees whom he managed, supervised, and/or worked with while at LKQ.

71.     Since Skipper began working for All Clear, multiple LKQ employees have left their employment with Elitek to work for All Clear.

72.     Upon information and belief, in performing his duties on behalf of LKQ's direct competitor All Clear, Skipper will use, rely upon, and disclose, and threatens to use, rely upon, and disclose, LKQ's confidential and proprietary business information described above, to unlawfully compete with LKQ in violation of his contractual obligations to LKQ.

73.     Skipper's violations of his restrictive covenant agreements and obligations to LKQ are irreparably harming the Company's legitimate business interests, including its customer and employee relationships, good will, and confidential information, among other interests.

74.     The harm LKQ has incurred and continues to incur as a result of Skipper's violations include loss revenues to LKQ's Elitek business that well exceed $75,000.

75.     Despite his knowledge of his contractual obligations to LKQ, Skipper's violations of his contractual promises to LKQ and resultant harm are ongoing and demonstrate Skipper's intent to continue his misconduct unabated.

## COUNT I
### (Breach of Contract – Breaches of 2021 and 2022 RSU Agreements)

76.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 75 above, as if set forth fully herein.

15

77.     LKQ and Skipper entered into separate RSU Agreements in each of 2021 and 2022, which, among other things, govern the granting and vesting of restricted LKQ stock to Skipper under the Company's equity incentive program.

78.     The RSU Agreements attached hereto at Exhibits A and B are valid and binding agreements.

79.     Skipper received good and valuable consideration for entering into the RSU Agreements, including, but not limited to, the right to receive LKQ stock under the terms set forth in the RSU Agreements.

80.     Skipper entered into, assented, and agreed to be bound by the RSU Agreements and the parties performed under the RSU Agreements, including, among other things, the granting, vesting, and exercising of LKQ stock in accordance with the terms and conditions of the RSU Agreements.

81.     LKQ has fully performed under the RSU Agreements and has performed any and all conditions precedent to the enforcement of the terms of the RSU Agreements.

82.     Skipper's agreement to be bound by and comply with the terms and conditions in Section 17 of the 2021 and 2022 RSU Agreements was a material inducement for LKQ to enter into the RSU Agreements.

83.     Skipper's compliance with the terms and conditions in Section 17 of the 2021 and 2022 RSU Agreements was an express condition to the granting and vesting of restricted stock under the RSU Agreements.

84.     Skipper voluntarily resigned his employment with and then separated his service to LKQ, effective October 14, 2022.

85.     After Skipper's employment with LKQ ended, LKQ learned that Skipper had begun a new position with All Clear.

86.     All Clear competes directly with LKQ's Elitek business in marketing, selling and providing the same or similar mobile, on-site vehicle services to the same customers as prospective customers to which Elitek markets, and sells and provides such services in the Southeastern United States, including within the territory that Skipper oversaw and exercised managerial control as an Area Manager for LKQ.

87.     Upon information and belief, Skipper is engaged in managerial, hiring, sales, and marketing activities on behalf of All Clear that are substantially similar to the activities that he performed as an Area Manager for LKQ relating to the marketing, sales and provision of mobile, on-site vehicle services.

88.     All Clear operates its business and provides competitive mobile, on-site vehicle services within the same geographic territory that Skipper worked for LKQ and/or over which Skipper exercised managerial control while employed by LKQ.

89.     Upon information and belief, Skipper has directly or indirectly engaged in soliciting and inducing LKQ's customers to purchase its mobile, on-site vehicle services from All Clear and/or to withdraw, curtail or cancel doing such business with LKQ in violation of his restrictive covenant obligations owed to LKQ, including within the territory that he oversaw and exercised managerial control for LKQ.

90.     Upon information and belief, Skipper has misappropriated, utilized, and disclosed LKQ's confidential information relating to its customer contracts, pricing, financial information, gross margins and other customer-related data to undercut LKQ's prices and to offer discounts to LKQ's customers to solicit business away from LKQ.

17

91.     Upon information and belief, Skipper has, directly or indirectly, engaged in soliciting for employment and/or hiring LKQ's employees whom he managed, supervised, and/or worked with while at LKQ.

92.     Upon information and belief, in performing his duties on behalf of LKQ's direct competitor All Clear, Skipper will use, rely upon, and disclose, and threatens to use, rely upon, and disclose, LKQ's confidential and proprietary business information described above, to unlawfully compete with LKQ in violation of his contractual obligations to LKQ.

93.     Skipper's conduct is in breach of the RSU Agreements, including under the terms and conditions set forth in Section 17 of the 2021 and 2022 RSU Agreements.

94.     Specifically, Skipper's competitive employment, solicitation of customers and LKQ employees, and use and disclosure and inevitable use and disclosure of LKQ's confidential business information, and other conduct on behalf of All Clear, constitute separate and independent breaches of the post-employment prohibitions in Section 17 of the RSU Agreements, including Sections 17(a)(i)(1) (the non-competition covenant), 17(a)(i)(2) (the non-solicitation of customers covenant), and 17(a)(i)(3) (the non-solicitation of employees covenant), and 17(a)(ii) (non-disclosure of confidential information covenant) in each of the 2021 and 2022 RSU Agreements.

95.     Skipper's breaches of the RSU Agreements have directly and proximately caused LKQ to suffer damages, including, but not limited to, damages to LKQ's customer goodwill, customer relationships, loss of customer business, and the granting of valuable restricted stock and other financial benefits to Skipper based on false or fraudulent pretenses and conduct in direct violation of the RSU Agreements.

FP 45966652.1

96.     Pursuant to the RSU Agreements, LKQ is entitled to any proceeds received by Skipper for the sale of shares granted under the RSU Agreements based on Skipper's breaches of Section 17 of the RSU Agreements.

97.     In accordance with the RSU Agreements, Skipper's forfeiture is effective as of the dates of his breach of the restrictive covenants contained in the respective RSU Agreements.  If the shares of stock provided under the RSU Agreements have been sold by Skipper, he is obligated to immediately pay LKQ the proceeds of any such sale.

98.     Skipper's actions are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of LKQ, entitling LKQ to an award of punitive damages.

99.     Skipper's violations of his contractual obligations under the RSU Agreements are ongoing and continue unabated.

100.    But for an exercise of the equitable powers of this Court, LKQ has no adequate remedy at law to address and/or compensate LKQ for Skipper and All Clear's unfair competition in violation of Skipper's contractual obligations, including the loss of customer goodwill and damage to LKQ's customer relationships, loss of competitive standing in the marketplace, and loss of the exclusive use of LKQ's confidential business information as set forth herein.

101.    But for an exercise of the equitable powers of this Court, LKQ will be irreparably injured and harmed by Skipper's continuing breaches of the RSU Agreements and the sale of restricted stock to which he is not contractually entitled.

102.    The balance of the equities favors issuing an injunction for LKQ's benefit and protection.

103.    LKQ is likely to succeed on the merits of its claim for breach of contract.

104.     LKQ requests that the Court enter judgment on Count I in its favor and against Skipper and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT II
### (Breach of Contract – Breaches of 2021 and 2022 RCAs)

105.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 104 above, as if set forth fully herein.

106.     LKQ and Skipper entered into each of the 2021 and 2022 RCAs.

107.     The RCAs attached hereto at Exhibits C and D are valid and binding agreements.

108.     Skipper received good and valuable consideration for entering into the RCAs, including his continued employment, compensation for his Area Manager position, the right to participate in the vesting and disposition of restricted stock, and training and access to LKQ's confidential business information.

109.     Skipper entered into, assented, and agreed to be bound by the RCAs.

110.     LKQ has fully performed under the RCAs and has performed any and all conditions precedent to the enforcement of the terms of the RCAs.

111.     Skipper's agreement to be bound by and comply with the terms and conditions in the RCAs was an inducement for LKQ to enter into the RSU Agreements, as expressly contemplated in the RSU Agreements.

112.     Skipper voluntarily resigned his employment with and then separated his service to LKQ, effective October 14, 2022.

113.     After Skipper's employment with LKQ ended, LKQ learned that Skipper had begun a new position with All Clear.

FP 45966652.1

114.    All Clear competes directly with LKQ's Elitek business in marketing, selling and providing the same or similar mobile, on-site vehicle services to the same customers as prospective customers to which Elitek markets, and sells and provides such services in the Southeastern United States, including within the territory that Skipper oversaw and exercised managerial control as an Area Manager for LKQ.

115.    Upon information and belief, Skipper is engaged in managerial, hiring, sales, and marketing activities on behalf of All Clear that are substantially similar to the activities that he performed as an Area Manager for LKQ relating to the marketing, sales and provision of mobile, on-site vehicle services.

116.    All Clear operates its business and provides competitive mobile, on-site vehicle services within a 75-mile radius of the locations out of which Skipper worked for LKQ and/or over which Skipper exercised managerial control while employed by LKQ.

117.    Upon information and belief, Skipper has directly or indirectly engaged in soliciting and inducing LKQ's customers to purchase its mobile, on-site vehicle services from All Clear and/or to withdraw, curtail or cancel doing such business with LKQ in violation of his restrictive covenant obligations owed to LKQ, including within the geographic territory that he oversaw and over which he exercised managerial control on behalf of LKQ.

118.    In doing so, upon information and belief, Skipper has misappropriated, utilized, and disclosed LKQ's confidential information relating to its customer contracts, pricing, financial information, gross margins and other customer-related data to undercut LKQ's prices and offer discounts to solicit business away from LKQ.

FP 45966652.1

119.    Upon information and belief, Skipper has, directly or indirectly, engaged in soliciting for employment and/or hiring LKQ's employees whom he managed, supervised, and/or worked with while at LKQ.

120.    Upon information and belief, in performing his duties on behalf of LKQ's direct competitor All Clear, Skipper will use, rely upon, and disclose, and threatens to use, rely upon, and disclose, LKQ's confidential and proprietary business information described above, to unlawfully compete with LKQ in violation of his contractual obligations to LKQ.

121.    Skipper's conduct is in breach of the RCAs.

122.    Specifically, Skipper's competitive employment, solicitation of customers and LKQ employees, and use and disclosure and inevitable use and disclosure of LKQ's confidential business information, and other conduct on behalf of All Clear, constitute separate and independent breaches of the prohibitions in Section 1 (the non-disclosure of confidential information covenant), Section 2 (the non-competition covenant), and Section 3 (the non-solicitation of customers and LKQ employees' covenant) in each of the 2021 and 2022 RCAs.

123.    Skipper's breaches of the RCAs have directly and proximately caused LKQ to suffer damages, including, but not limited to, damages to LKQ's customer goodwill, customer relationships, loss of customer business, and other monetary damages.

124.    Skipper's actions are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of LKQ, entitling LKQ to an award of punitive damages.

125.    Skipper's violations of his restrictive covenant obligations to LKQ are ongoing and continue unabated.

FP 45966652.1

126.    But for an exercise of the equitable powers of this Court, LKQ has no adequate remedy at law to address and/or compensate LKQ for Skipper's and All Clear's unfair competition in violation of Skipper's contractual obligations, including the loss of customer goodwill and damage to LKQ's customer relationships, loss of competitive standing in the marketplace, and the loss of the exclusive use of LKQ's confidential business information described herein.

127.    But for an exercise of the equitable powers of this Court, LKQ will be irreparably injured and harmed by Skipper's continuing breaches of the RCAs.

128.    The balance of the equities favors issuing an injunction for LKQ's benefit and protection.

129.    LKQ is likely to succeed on the merits of its claim for breach of contract.

130.    LKQ requests that the Court enter judgment on Count II in its favor and against Skipper and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT III
### (Unjust Enrichment)

131.    Plaintiffs repeat and re-alleges the allegations contained in Paragraphs 1 through 130, above, as if set forth fully herein.

132.    Pleading in the alternative, and without prejudice to Plaintiffs' above allegations and claims that Skipper has engaged in a breach of his contractual obligations to LKQ under the RSU Agreements, Skipper has been unjustly enriched based on his conduct, and to Plaintiffs' detriment, through the granting and sale of restricted stock under LKQ's incentive compensation plan.

133.    Skipper's conduct as described herein constitutes circumstances wherein it would be manifestly unjust, grossly unfair, and unconscionable to allow Skipper to retain any benefit or

profit generated from his sale of the stock that was granted to him under LKQ's equity incentive compensation plan.

134.    Plaintiffs request that the Court enter judgment on Count III in its favor and against Skipper and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

### REQUESTS FOR RELIEF

WHEREFORE, LKQ and Keystone request that this Court:

A.    Enter a preliminary and then a permanent injunction, restraining and enjoining Skipper, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from:

1.    using, disclosing, or transmitting to any individual or entity, for any purpose, the following confidential information from LKQ: (a) information regarding LKQ's financial performance, metrics, revenue, business forecasting, business development plans or strategic planning, and information constituting or concerning LKQ's arrangements, plans, strategies, negotiations, discussions and/or communications relating to its customers; (b) information constituting or concerning LKQ's corporate operations, including its sales personnel; and (c) information constituting or concerning LKQ's pricing, sales initiatives and techniques, customer relationships, or any other proprietary or trade secret information;

2.    engaging in any employment or competitive conduct prohibited under the non-disclosure of 2021 and 2022 RSU Agreements and the 2021 and 2022 RCAs; and

3.      exercising, selling, or otherwise disposing of any LKQ stock obtained under or arising out of the terms and conditions of the 2021 and 2022 RSU Agreements entered into between LKQ and Skipper.

B.      Enter judgment on Counts I, II, and III of the Complaint in favor of LKQ and Keystone, and order Skipper to repay LKQ for the full amount of any proceeds obtained based on the sale or disposition of LKQ stock obtained under or arising out of the RSU Agreements.

C.      Enter judgment on all Counts of the Complaint in favor of LKQ and Keystone, and order Skipper to pay all damages allowable by law to LKQ and Keystone including, without limitation, all damages caused by Skipper's unlawful competition in violation of his agreements with LKQ; compensatory and consequential damages to LKQ and Keystone in an amount to be determined at trial; an award in favor of LKQ and Keystone for its costs and attorneys' fees associated with this action; an award of punitive damages to LKQ and Keystone in an amount to be determined at trial; any such other and further legal and equitable relief as the Court deems appropriate or just.

Dated:  January 3, 2023                    Respectfully submitted,


                                    By:     /s/ Craig R. Annunziata
                                            One of the Attorneys for Plaintiffs,
                                            LKQ Corporation &
                                            Keystone Automotive Industries, Inc.


Craig R. Annunziata
cannunziata@fisherphillips.com
James M. Hux, Jr.
jhux@fisherphillips.com
FISHER & PHILLIPS, LLP
10 S. Wacker Drive, Suite 3450
Chicago, IL 60606
(312) 346-8061 (TEL)
(312) 346-3179 (FAX)

FP 45966652.1